130 So.2d 791 (1961)
Jack D. PHILLIPS, Plaintiff-Appellee,
v.
MID-CONTINENT LIFE INSURANCE COMPANY, Defendant-Appellant.
No. 9499.
Court of Appeal of Louisiana, Second Circuit.
May 5, 1961.
Rehearing Denied June 1, 1961.
Certiorari Denied June 30, 1961.
*792 Morgan, Baker, Skeels, Middleton & Coleman, Shreveport, for appellant.
Joseph S. Guerriero, George Fink, Monroe, for appellee.
GLADNEY, Judge.
Jack D. Phillips instituted this suit against Mid-Continent Life Insurance Company for damages arising from the latter's cancellation of a written contract appointing plaintiff the general agent for procuring and writing all of defendant's insurance business in this State. Defendant filed exceptions of no cause and no right of action which were overruled. Answer was subsequently filed wherein defendant asserted the cancellation was effected for justifiable cause, and further prayed, by way of reconventional demand, for judgment against Phillips pursuant to the terms of a $10,500 promissory note executed by Phillips in favor of defendant, subject to credits of some $900 received as payment on said note.
After trial on the merits, the lower court rendered judgment for plaintiff and against Certified Life Assurance Company, stipulated to be the legal successor to Mid-Continent Life Insurance Company, in the amount of $53,377.11. There was judgment against Phillips on the reconventional demand in the amount of $9,600 with 6% per annum interest from October 14, 1957, until paid. From the judgment so rendered defendant has appealed. Plaintiff answered the appeal and requested that the judgment in his favor be increased to the sum of $210,000.
On January 30, 1957, plaintiff and R. A. Fitzsimmons, president of Mid-Continent Life Insurance Company, executed a written contract whereby Phillips was appointed the general agent for defendant and the territory of the State of Louisiana was assigned exclusively to him, except for such contracts as existed prior to the execution of said agreement. Phillips was authorized to solicit applications for Accident and Health, and Hospitalization insurance in defendant company, to forward same to the defendant for its approval or rejection as defendant at its option might choose, and to collect the initial payments due on such applications. Phillips was empowered to appoint and employ at his own expense sub-agents for the purpose of soliciting applications and selling insurance plans. The contract further provided:
"The Agent shall pay all expenses incurred by him in the performance of this Contract, and except as otherwise provided herein, shall be entitled to and shall receive as full compensation for such expenses and for his services, commissions and renewal commissions on premiums on policies issued on applications secured by said Agent, according to the following schedule:

"Schedule of Commissions and Renewals
 "For all hospitalization and Health
and Accident Insurance except Franchise
Group. Registration fee in addition
to all commissions 100%
"If sold Monthly:
 First Monthly premium 100%
 Renewals, 2nd through 3rd
 month 100%
 Renewals thereafter 20%
"If sold Quarterly:
 First Quarterly premium 100%
 Renewals thereafter 20%
"If sold Semi-annually:
 First Semi-annual premium 70%
 Renewals thereafter 20%
"If sold Annually:
 First Annual premium 50%
 Renewals thereafter 20%

"Renewal commissions will be paid on or about the 10th of the following month.
* * * * * *

*793 "All printed matter or other supplies furnished by said Company to the said Agent are the property of the Company, and shall be promptly returned to the Company upon termination of this Contract. No circulars, advertisements or other matter shall be published, printed, distributed or used in any way by the Agent until the same shall first have been approved, in writing, by the Company.
* * * * * *
"To maintain this Contract in full force and effect the Agent must produce the monthly equivalent of $1,000.00 per month of new business, in each state assigned to the Agent for agency operations * * * The said Agent shall have fully vested compensation as pertaining to initial commissions and renewal commissions, for as long as said Company shall retain any and all applications for Accident and Health or Hospitalization insurance, unless the Company's claim ratio shall exceed forty-five per cent, in which event the vested portion of this Contract shall cease to pertain, and the Agent and the Company shall mutually agree on any further commissions or renewal commissions to be paid on account of this Agreement.
* * * * * *
"This Contract may be terminated by either party hereto by giving ten (10) days written notice, in the event of the failure of either party hereto to abide by the provisions of this Agreement, or to perform such functions as may be required by the provisions of this Agreement. The failure of the Company or the Agent to cancel or terminate this Contract in case of the failure of the other to comply with the provisions of this Contract, or the failure of either party hereto to take action or assert any right it may have hereunder, shall not constitute a waiver of such right or privilege.
* * * * * *
"The Company will furnish said Agent a statement of his renewal commissions on or about the 10th of the following month and said Agent qualifies for his renewals commissions. Upon receipt of such statement and remittance, the Agent shall immediately examine same, and if not satisfied as to the accuracy and correctness of same, shall return said statement and remittance to the Company with full particulars of any discrepancy herein. Failure of the Agent to notify the Company within ten days from the date he receives such statement and remittance shall be deemed an admission by the Agent of the accuracy and correctness of such statement and remittance."
After procuring said general agency contract, Phillips, at his own expense, enlarged the existing offices maintained by defendant in Monroe, and established offices in Alexandria, Baton Rouge, Crowley, New Orleans and Lafayette. Phillips expended substantial amounts for office furniture and equipment, and considerable time, energy and expense were devoted to recruiting, hiring and training sales personnel throughout the state. In order to finance these statewide operations Phillips found it necessary to borrow considerable capital. He secured a loan of some $10,500 from defendant, and a promissory note was executed by Phillips as evidence of said loan on October 14, 1957. The note was in the full amount of $10,500 with 6% per annum interest, and provided for payment at the rate of $300 per month from November 1, 1957 to July 1, 1958, and thereafter at $500 per month so long as any part of the principal or interest remained unpaid. The parties also executed the following written contract on the same date, October 14, 1957:
"Mid-Continent Life Insurance Company of Shreveport, Louisiana herein called Company and Jack D. Phillips and Associates of 323 ½ Harrison *794 Street, Monroe, Louisiana, herein called Agent have on this 14th day of October, 1957, made the following Supplementary Contract, which shall be attached to and be made a part of the Contract and Agreement entered into by the parties hereto on the 30th day of January, 1957, the provisions of the said Supplementary Contract to be as follows, to-wit:
"1. The effective date of this Agreement shall be the date hereof, October 14, 1957.
"2. This Agreement shall remain in effect so long as there is any amount outstanding on the loan which the Company shall make to the Agent as of this date, said note to be for the sum of ten thousand five hundred ($10,500.00) dollars, at six (6%) percent per annum.
"3. The Agent agrees to repay said loan in monthly installments of three hundred ($300.00) dollars, beginning November 1, 1957 and continuing to July 1, 1958, at which time the said monthly payments shall be increased to five hundred ($500.00) dollars, and shall continue until such time as the principal and interest of the said note are completely satisfied.
"4. The Agent hereby agrees that both he, personally, and Phillips and Associates, shall be responsible for the loan and loan repayment provisions stipulated in sections 2 and 3 hereof.
"5. The Agent hereby agrees that any and all provisions of the Contract and Agreement dated January 30, 1957 pertaining to vested rights, or vested renewals, shall be null and void so long as there shall be any outstanding indebtedness due the Company by Phillips and Associates and or Jack D. Phillips, Jr.
"6. Both parties hereto agree that this Supplemental Contract shall abrogate and supercede any and all previous Agent's or General Agent's Contracts that may have been negotiated by the parties hereto prior to the date hereof."
Installments of $300 each on November 1, 1957 and December 1, 1957, were withheld by defendant from commissions forwarded to Phillips, and defendant credited said note with the $300 payment due January 1, 1958, from monies held by defendant which were due Phillips. By letter dated November 26, 1957, Fitzsimmons informed Phillips that defendant was, by availing itself of the provisions of their contract, immediately terminating all contractual agreements between the parties. On November 27, 1957, Fitzsimmons dispatched telegrams to the various agents employed by Phillips and informed them Phillips was no longer connected with defendant, and that proposals for an improved commission schedule and more liberal renewal basis would be forwarded to them. Within two weeks following termination of the Phillips contract, defendant entered into agreements with several of the agents who had been working under Phillips. The terms of the new contracts were more advantageous to both defendant and the agents inasmuch as the override previously enjoyed by Phillips was no longer outstanding. Defendant also derived some benefit from the branch offices established by Phillips, although not all of said offices were utilized after Phillips' dismissal.
Under the aforestated circumstances, plaintiff instituted suit for damages in the amount of $210,000 representing alleged expenditures of some $20,000 during the ten month period the contract was in effect, and also including loss of anticipated renewal commissions of $20,000 and new policy commissions of $60,000 for each of the years 1958 and 1959. By means of a supplemental petition plaintiff reserved the right to file suit for renewal commissions that mature and become payable to him subsequent to the year 1959 under insurance contracts written by him prior to his dismissal by defendant.
The principal ground upon which defendant resists this suit, and that upon which its exceptions of no right and no cause of action were predicated, is that the agency *795 contract was one for personal services without a term and was therefore terminable at will. Defendant further contends that the supplementary contract did not supply the original contract with a term for employment, but merely provided a limited term, viz., so long as any amount remained outstanding on the loan, for the suspension of the agent's vested rights to renewal commissions. Defendant urges as an alternative argument that should the supplemental contract be regarded as providing a term of employment, then said agreement contains a potestative condition in that the execution of the agreement depends upon an event which is in the power of the obligor to perform, and hence is a nullity.
The aforesaid exceptions were overruled and upon trial of this cause, defendant sought to show justifiable cause for its cancellation of the agency contract. To that end evidence was tendered to establish that plaintiff had not produced the required monthly equivalent of $1,000 in new business for several of the months when the contract was in effect. Said evidence was ruled inadmissible in accordance with the conclusion reached by the trial judge in pretrial conference that defendant was estopped from asserting plaintiff's alleged violations which occurred prior to the execution of the supplemental contract. The same ruling was applied to defendant's attempt to show the company's claim ratio exceeded 45%, which, under the terms of the contract as aforequoted, purported to terminate the agent's vested right to commissions. The last cause for which defendant claims justification for termination is that plaintiff violated the contract by distributing advertising circulars without complying with the terms of the contract requiring that the company's consent in writing be first obtained. Evidence of plaintiff's violation in this regard was excluded by the trial judge on the ground that defendant first became aware of the circulars the day after Fitzsimmons' letter of termination, and the alleged violation could not, therefore, have been the motivation for the termination. It should be mentioned that the trial judge ruled defendant could present evidence of plaintiff's violations as cause for cancellation of the contract if it were first shown that defendant became aware of the violations after execution of the supplemental contract but before termination of the agency contract.
The aforediscussed rulings of the lower court with reference to the exceptions of no cause and no right of action and the estoppel of defendant to show plaintiff's violations of the contract as cause for termination of the agency were assigned by counsel for defendant as erroneous. Further assignments of error to the judgment of the lower court were made with reference to the computation of damages, to-wit: that the trial court erred in declaring plaintiff should be reimbursed for first year expenditures when such sums were in fact, usual and necessary expenditures for the production of revenues anticipated by the contract; and, that the trial court erred in awarding plaintiff damages for breach of contract because there is no basis for an expectation that plaintiff's revenues under the continued operation of the agency would have been in excess of his attendant expenses.
The voluminous transcript of this cause contains the testimony of the following five witnesses, plaintiff; Harry M. Bell, a certified public accountant testifying on behalf of plaintiff; R. A. Fitzsimmons; H. A. Howard, who was office manager of Mid-Continent at the time of plaintiff's agency with that company; and Robert K. Marquess, a certified public accountant testifying on behalf of defendant. Although the testimony of each of the witnesses has bearing upon several issues herein, we have deemed it advisable for the purpose of orderly examination, to briefly summarize the testimony of each witness, rather than attempt to separately examine the testimony as to particular issues.
Jack Phillips testified that after procuring the agency contract with defendant he devoted *796 a great deal of time, labor and expense in an attempt to build up a statewide sales network. He testified to business expenses of $18,750 incurred by him in 1957. That figure was taken from Phillips' 1957 income tax return and represents expenditures for commissions and salaries, office rental and supplies, taxes, utilities, legal and audit expenses, and travel expenses. Plaintiff introduced into evidence some seventy-five subagency contracts by the terms of which the sub-agents were to receive 100% of the first month's business which they procured and a percentage, estimated by plaintiff as 50%, of the renewal commissions on said business. Phillips stated he was of the opinion that it would take some two years for him to establish his operations to the extent that profits would be realized therefrom. He testified that his gross receipts under the agency contract were $43,057.65, from which figure he paid sub-agents commissions of $33,043.26. Plaintiff admitted that in order to realize a profit from his business in future years he would either have to increase his volume of business or reduce his overhead.
Bell, plaintiff's accountant, testified his examination of defendant's books disclosed: new policy commissions of $41,653.24 were paid by the company during the period February 1, 1957, to November 30, 1957, of which amount plaintiff was entitled to $31,535.03; that during the same period the company's renewal commissions amounted to $30,707.72, of which plaintiff was entitled to $14,961.53; and that some $13,068.91 was carried on defendant's books as Officers' Commissions. Bell also prepared a schedule computing plaintiff's damages arising from termination of the agency contract. The schedule was based on a thirty-six month period allegedly supplied by the Supplemental Contract, and the total damage estimation was $125,089.38.
Fitzsimmons admitted writing the termination letter to plaintiff and sending the telegrams to the various sub-agents. He testified further that subsequent to the termination of Phillips' contract the defendant company entered into agency contracts with those agents who had been in defendant's employ prior to Phillips' agency and who during Phillips' agency had been turned over by defendant to Phillips; that several agents recruited by Phillips were likewise retained by the company after Phillips' dismissal; that subsequent to the dismissal defendant has only utilized the Monroe and Shreveport offices; that during the effective period of Phillips' agency defendant's only other authorized general agency within this state was that of Treadway-Collier in Bossier City, but that there were various agency contracts still in existence due to the fact that agents who had sold policies prior to Phillips' employment were still entitled to renewal commissions under the old policies; that he, Fitzsimmons, first became aware on the day following the termination letter of plaintiff's distribution of certain advertising circulars; that the commissions paid officers of defendant company had nothing to do with, nor in any manner impinged upon, agency contracts or commissions; that the average effective term of Health and Accident policies is fifteen months; and that approximately 50% of the business upon which a first premium is paid never renews.
Herbert A. Howard, office manager of defendant company, testified that due to the fact hospitalization policies are so frequently lapsed, estimated at about 5% of the total in-force business each month, it was his opinion that agents in order to be successful would have to show profits during the first year. Howard explained that the officers' commissions were computed as 10% of all renewal premiums, and that said commissions were paid from that portion of the renewals retained by the company without in any manner detracting from commissions due the agents. Howard opined, as had Fitzsimmons, that approximately 5% to 6% of the total in-force business lapsed each month, or about 72% each year.
Robert K. Marquess was accountant in charge of defendant's records during the period September 1, 1957, to September 1, *797 1958. Marquess testified that during the year 1957 the Treadway-Collier agency was paid $6,419.38 in new business commissions and $2,385.73 in renewal commissions; that defendant paid total new business commissions for the year of $47,492.71 and total renewals of $32,492.21; that in 1958 total new business commissions were $22,933.55 and total renewals were $27,184.39; that 100% of the first three months' premiums on every policy was paid to the agent and consequently, the company's profits would have to arise after the fourth month; that the officers' commissions were merely computed upon the basis of 10% of all renewal premiums but did not detract from the 100% of the first three months' premiums which was due the agents; that $47,492.71 was paid out in 1957 as new business commissions whereas $51,370.96 was received by the company in new business premiums, the difference being attributable to the fact that agents were not entitled to 100% of the premiums on annual or semi-annual policies, and also due to the fact that the referred to commissions were figured on a ten rather than a twelve month basis; that out of the $47,492.71 in new business commissions, Phillips received $34,745.96 and the remainder went to Treadway-Collier, Mr. Howard and various sub-agents who had been employed prior to the Phillips contract; that of the $32,492.21 paid out in 1957 as renewal commissions $16,193.02 went to officers as their 10%, and $8,311.68 was paid to Phillips with the remainder attributable to various sub-agents before and after the effective period of Phillips' contract. Marquess testified that from his examination of Phillips' books he calculated that Phillips' operating expenses for 1957 were $17,285.00 as compared to net receipts of $11,747.00.
Counsel for appellant have assigned error to several rulings of the trial judge. The first contention so made is that the contract of employment herein involved was one for rendition of personal services for an indefinite term, and was subject to revocation at the will of either party. Cited in support of this principle is LSA-C.C. Art. 2747; Lowther v. Fireside Mutual Life Insurance Company, 1955, 228 La. 946, 84 So.2d 596; and United Credit Company, Inc. v. Croswell Company, Inc., 1951, 219 La. 993, 54 So.2d 425. The principle relied upon is well recognized but is without application to the facts presented. On October 14, 1957, appellant and appellee executed a supplementary agreement which amended and supplied a definite term in lieu of the indefinite term previously in effect. The agreement then provided the appellee's contract of employment would extend until payment in full of his note in fixed monthly installments. Counsel say the principal purpose of the supplemental contract was to effect a suspension of renewal commissions for as long as the note remained unpaid. This argument does not, however, alter the disclosed intent of the parties and, accordingly, there is no error in the ruling of which complained.
Alternatively, appellant urges that insofar as the supplementary agreement can be said to provide for a term of employment, such a contract contains a potestative condition and is prohibited by LSA-C.C. Arts. 2024 and 2034. These articles, together with Article 2035, have been construed to imply that the obligation is voidable provided the nullity is set up seasonably and not after the contract has been performed. Where there has been partial performance it has been held that the contract is not null and void because of containing a potestative condition. Hansman v. Uddo & Taormina Company, La.App.Orleans, 1955, 76 So.2d 753, 755. Initially, the contract was one of personal employment and might have been terminated at the will of either party, but as hereinabove pointed out, it was given a definite term by the supplemental agreement.
Still another error assigned to the decree under review is that plaintiff breached his contract in several particulars, including, inter alia, his failure to submit advertising for approval by the home office, and also his failure to produce $1,000 *798 monthly in new business. The trial judge held that evidence of known violations of the contract by appellee prior to October 14, 1957, was inadmissible in view of appellant's conduct in extending the contract, basing his ruling on estoppel. We are of the opinion the ruling was correct as it is a well recognized fact that where a person has, with knowledge of the facts, acted or conducted himself in a particular manner, or asserted a particular claim, title, or right, he cannot afterward assume a position inconsistent with such act, claim, or conduct to the prejudice of another who has acted in reliance on such conduct or representations. 31 C.J.S. verbo Estoppel § 108, page 341.
Appellant also urges the trial court erred in several other respects relating to the assessment of damages. These involve purely factual issues which are hereinafter resolved.
In our opinion, the damages to which plaintiff is entitled should be determined upon the basis of the term payment schedule appearing in the Supplemental Contract. Under such schedule payment of principal and interest on the loan would continue until February 1, 1960. Consequently, we find that the agency contract should have remained in force from its execution on January 30, 1957, until February 1, 1960, or a total term of 36 months. However, the record fails to substantiate plaintiff's contentions that he was not paid all of the commissions to which he was entitled prior to termination of the contract. The testimony of defendant's accountant, Marquess, sufficiently disposes of those contentions and explains the commissions paid to agents other than Phillips, as well as the item of officers' commissions. Furthermore, plaintiff admitted that he had no substantial dispute with defendant's accounting of commissions from policies submitted by his agency, and he further testified that his real concern was with reference to the amount of business placed with defendant after February 1, 1957, for which he received no accounting. In this regard, Bell's examination of defendant's books revealed that $51,370.96 in new policy premiums was received by the company from February through November, 1957, whereas plaintiff only received $34,745.96 in new business commissions. This alleged discrepancy was explained by Marquess' testimony that not all new policy premiums are subject to 100% agent commissions, particularly, annual and semi-annual premium policies; of the $41,653.24 paid out by the defendant as new policy commissions during the ten month period in question, $34,745.96 went to plaintiff, $40.02 to Howard, and $4,284.92 to Treadway; and that all other commissions on new policy business for the year 1957 were attributable to business procured prior and subsequent to plaintiff's agency with defendant company.
Consequently, the computation of damages prepared by Bell based on the assumption that Phillips had not received all commissions to which he was entitled in 1957, is of only limited assistance to our inquiry. And, inasmuch as plaintiff has received the remuneration due him for the period prior to December of 1957, our projection of damages must be based on a twenty-six month period rather than the thirty-six month period contended for.
Our examination of the damages sustained by plaintiff may be categorized into three general divisions: 1957 expenses incurred establishing a state-wide sales network; net new business expectancies for the twenty-six month period subsequent to November 26, 1957; and net renewal expectancies for the same period.
Plaintiff testified to business expenses of some $18,750 in 1957. Certain of those expenses are directly attributable to plaintiff's attempt to establish a permanent sales agency, and are distinguishable from expenses which were merely incidental to production of the first year's business and which would have required duplication had the contract remained in force. We are of the opinion the first category of expenses is recoverable as an item of damages in the *799 instant proceeding. The items for interest, supplies, and legal and auditing expenses, are recoverable in their entirety, while approximately one-half of the expenses allocated to travel, automobile, advertising and incentive salaries are likewise recoverable. We have arrived at the figure of $7,847 as representing expenses which probably would not have required repetition in future years, specifically: interest $497; supplies $1,942; travel $700; legal and auditing $751; auto expenses $400; advertising $700; and incentive salaries $2,857.
In an effort to determine plaintiff's reasonable renewal commission expectancy for the remainder of the contract term, we have given careful consideration to the amount of renewal commissions earned by plaintiff during 1957. We are also cognizant of the testimony in the record relative to the high lapse rate of health and accident policies. It is our conclusion that plaintiff could have reasonably expected his renewal commissions to increase at the rate of approximately $100 per month for the duration of the contract term. For the purpose of projecting the estimated growth factor we have resolved upon a base monthly renewal commission of $1,459.84. The $100 per month growth factor applied to that figure and projected through the twenty-six month contract term results in a gross renewal commission expectancy of $73,055.84.
Plaintiff received $34,745.96 in new business commissions for the ten months duration of his agency. In our opinion, plaintiff could have reasonably expected an increase of approximately 10% per year in procurement of new business. Accordingly, for the first twelve months of the twenty-six month term his new business expectancy is $45,864.72; for the next twelve month period it is $50,451.12; and for the remaining two months it is $9,249.36. The gross new business expectancy is therefore $105,565.20.
From the gross renewal and new business expectancies as above computed, we must estimate and deduct the amount of commissions which Phillips could expect to pay his sub-agents. Phillips testified that out of the $43,057.64 total commissions received by him in 1957 he paid his sub-agents some $33,043.26, or approximately 76%. Applying the same sub-agents' commissions percentage to the $178,621.04 gross renewal and new business expectancy leaves Phillips with a total commission expectancy of $42,869.05 over and above the amounts which he would have had to pay his sub-agents.
The expenses which we consider attributable to the production of the above estimated expectancy are $23,628.08, the monthly average of the 1957 necessary expenses ($10,903 divided by 12 = $908.58) multiplied by 26 months. Plaintiff's net renewal and new business expectancy for the remaining 26 months under the agency contract is therefore calculated to be $19,245.97.
Additionally, plaintiff is entitled to have included in his award the amount of renewal commissions due him for the month of November, 1957. The commissions in the amount of $984.98 were tendered by defendant in December of that year and rejected by plaintiff. The judgment of the lower court credited $300 of that amount toward payment of the promissory note made the basis of defendant's reconventional demand. We are, therefore, of the opinion Phillips' judgment should include the amount of $684.98 as commissions due him prior to termination of the agency contract. The lower court's judgment in favor of defendant, plaintiff in reconvention, on the reconventional demand is correct and should be affirmed.
Plaintiff's judgment should, therefore, include the following items of damage: 1957 recoverable expenses in the amount of $7,847; 1957 commissions in the amount of $684.98; expected business profits in the amount of $19,245.97, or a total of $27,777.95.
Accordingly, it is ordered, adjudged and decreed that the judgment of the lower court in favor of plaintiff and against defendant, Certified Life Assurance Company, *800 (successor to Mid-Continent Life Assurance Company), be reduced from $53,377.11 to the amount of $27,777.95, with reservation to plaintiff of the right to demand and institute suit for renewal commissions maturing and becoming payable to plaintiff subsequent to February 1, 1960, under insurance contracts heretofore procured by him. As reduced and amended, the judgment of the lower court is affirmed. Defendant is cast with costs of this appeal.