Robert E. WRIGHT, Sr.

v.

SOUTHWESTERN LIFE INSURANCE COMPANY.

Civ. A. No. 14562.

United States District Court,
W. D. Louisiana,
Monroe Division.

Aug. 1, 1972.

William H. Baker, Bobby L. Culpepper, Holloway, Baker, Culpepper & Brunson, Jonesboro, La., for plaintiff.

Solomon S. Goldman, Goldman & Levin, New Orleans, La., for defendant.

OPINION

DAWKINS, Chief Judge.

Plaintiff entered into an agreement with Southwestern Life Insurance Company to canvass for applications for life insurance on October 10, 1955. There were four written amendments to the contract, effective respectively on November 1, 1955, March 1, 1958, February 1, 1960, and March 14, 1962 (attached hereto as Appendices 1 through 5). Wright was one of the first agents in Louisiana to write business for Southwestern Life Insurance Company.

As a result of a certain research project, he sustained physical injuries and in 1958 an automobile accident further restricted his ability to sell life insurance "door to door." Following passage by Congress of the Technical Amendments Act of 1958, in the latter part of that year, plaintiff became interested in selling tax-sheltered annuities plans (TSAP). This is a type of annuity which permits persons participating to receive a portion of their salaries after retirement while in a lower tax bracket. Wright's educational background, including Bachelor and Master Degrees from L. S. U., and his prior employment with the L. S. U. Agricultural Experimental Station in Houma, Louisiana, prepared him exceptionally well to solicit business for a TSAP. His first attempts were directed at employees of the St. Francis Hospital, in Monroe, Louisiana. After another agent for Southwestern, Richard Troy, secured an application for an annuity contract with one of the physicians at the hospital, plaintiff no longer pursued the program there.

Having referred to recent insurance journals and the Research and Review Service, Wright became interested in presenting the program to the various colleges and universities in Louisiana. Directly attributable to his efforts, Southwestern became the first insurance company to write annuity programs for colleges in Louisiana and, indeed, in the nation.

Despite several trips to Southwestern's home office in Dallas, Texas, Wright was unable to obtain significant assistance from the Company in laying the groundwork for the hoped for annuity programs. Southwestern's reluctance was ascribed, properly but not exclusively, to its hesitation in engaging in the unauthorized practice of law or giving tax accounting advice. However, Wright obtained, after numerous letters to and from Congressman Otto Passman, a personal visit with the Congressman, and conferences with others, a Treasury Department Revenue Ruling that Louisiana Colleges, in particular Northeast Louisiana State College, were organized and operated exclusively for educational purposes, and, as such, were exempt from Federal income tax under Section 501(c)(3) of the Internal Revenue Code of 1954. This ruling, obtained at some personal expense and much time, was critical to Northeast's participation in TSAP. A great deal of work was done preliminarily, with attendant expenditure of time, in presenting the program to the Louisiana State Board of Education. Letters to the Board members and appearances before the Board without the presence of home-office Southwestern personnel resulted in his obtaining permission for the different colleges under the Board's control to let franchises for the program.

In May of 1961, the first TSAP franchise was signed with Northeast Louisiana State College after bids were called for twice. With minor exceptions, all forms and information were prepared by Wright and his associates. Salary renegotiation forms and an important formula for premium payments by employees of the College over a nine months, rather than on a twelve months, basis were prepared solely by plaintiff. Equipment was obtained by Wright better to serve the annuitants under the program.

In October, 1961, Northwestern State College and McNeese State College were added to Southwestern Life Insurance Company's annuity program, utilizing

the invaluable research and work done by Wright in connection with his having secured the Northeast franchise.

The Treasury Department, in November, 1961, recalled its earlier exemption from Federal income tax under Section 501(c)(3) of the Internal Revenue Code, but noted that H.R. 4317 had been signed by the President on October 4th, 1961, amending Section 403(b), so that it no longer was necessary for public schools to file applications with the Commissioner of Internal Revenue for classification as "organizations" described in Section 501(c)(3) in order for their employees to purchase annuities under Section 403(b). This amendment granted direct permission under the statute, obviating a Revenue Ruling for the State Colleges and Universities to proceed with the program.

Shortly thereafter, Nichols State College and Southeastern Louisiana College let franchises to Southwestern Life Insurance Company. Later in 1962, Louisiana Polytechnic Institute was added; Southern University and A. & M. College signed a franchise with Southwestern in 1963; and, in 1964, Grambling College, Southern State College, in Magnolia, Arkansas, and Lincoln Parish School Board were added. By 1963, Southwestern's home office requested and received as much information as Wright had gathered on the section 403(b) annuity program to aid them in their attempt to prepare information for general distribution in Louisiana and other States.

Undeniably, as to several of the franchise contracts, and at every one of the schools in which a franchise was obtained, Wright was considered by the Colleges and by Southwestern as the "servicing agent." His familiarity with the program and his contact with each of the presidents of the colleges made him the single person best able to service the program.

Because of the volume of business involved, and in order to keep contact with each of the franchises, Wright entered into several agreements with different persons permitting them to write policies at an agreed-on percentage split. At least two of these contracts were suspended by Wright. Obviously, those parties could not bind Southwestern, which was not a signatory, and one contract expressly recognized that fact.

Early in the formative stages of the program, Wright attempted to secure from Southwestern his position as the sole agent authorized to sell such policies in Louisiana. He was advised that the best way to protect his position was to provide good service to each one of the franchises which he had been instrumental in obtaining and to secure agent's letters of record from the individual colleges and universities. Not until March and April of 1968 did Wright have agent's letters of record signed by each of the institution's presidents. The record indicates that in 1961 a problem arose concerning a Southwestern agent, unconnected with Wright, soliciting business in one of the universities whose franchise had been procured by Wright. This problem apparently was solved without difficulty. However, it did prompt Wright to inquire again of Southwestern as to just how he might protect his past and future time in promotion of the program.

The evidence shows that even had there been agent's letters of record from the College presidents long prior to 1968 those letters would not have prevented Southwestern from permitting others of its agents to solicit business on these campuses. Not only was Southwestern not a party to those letters, but it would have been foolish for them to agree to their exclusivity in Wright's hands. Southwestern understood, as Wright must have, that limiting the number of agents who could canvass employees of the different colleges and universities would severely curtail the number of policies written. It was literally impossible for Wright and the few people with whom he had personally contracted

to solicit and share business which physically would cover the hundreds, if not thousands, of employees of all the institutions of higher learning in the State. Those few men could not possibly possess the numerous necessary contacts that other Southwestern agents had developed through their years of living in communities where colleges and universities were located, and thus becoming personally acquainted with so many eligible employees.

Blacklock, the Regional Manager, explained the Company's thoughts regarding the various State Colleges and Universities and proper procedure for other agents to write tax-sheltered annuities under franchises secured by Wright, in a letter in early 1968. The letter noted that the Company would accept applications for these annuities under two conditions:

"1. The agent or broker who is to receive credit for the business has been approved by the manager of the territory where the agent or broker resides.

"2. The authorized personnel of each institution is willing to sign the application submitted to them by said approved agent or broker.

"If the above two requirements are not met, then it is the Company's opinion that any agent or broker who has been approved by the manager in the territory where he resides should work with Mr. Wright and it will be the responsibility of the manager to see that the business is sold correctly and processed in the usual manner in which Mr. Wright processes his business." (Ex. P–34.)

Serious problems arose when other Southwestern agents attempted to write policies in 1967 and early 1968. Those attempts precipitated a conference with Mr. Wright, his wife, Jeff Nickelson, Senior Vice President in Charge of Sales, Don Williford, Shreveport Branch Manager, and Winston Blacklock, Regional Manager, in attendance. Shortly thereafter, a letter was written to Dr. Kilpatrick, President of Northwestern State College, outlining the Company's procedures for handling the business in the future written at that College. (See Exhibit P–43.) In response to that, Wright contacted the law firm of Barham, Wright and Dawkins, of Ruston, Louisiana. April 10, 1968, Mr. Barham, of that firm, wrote a lengthy letter to the President of Southwestern (see Exhibit P–33A) explaining Wright's opposition to any other agent's thereafter writing business in the several institutions, with copy to each of those institutions' presidents. A week later, the contract between Southwestern Life Insurance Company and Wright was terminated by the Company's Senior Vice President, Jeff Nickelson.

If from 1961 through 1966 it was Company policy that an agent who had spent a great deal of time on any program was entitled to a reasonable period in which to exploit the new area as well as he could, it by no means was considered an amendment to the agency contract. It is true that from 1961 through 1964, when the first and the last franchises were let, Wright was encouraged to canvass those areas while the Company discouraged other Southwestern agents from writing these tax-sheltered annuity programs. With the exception of the minor problem in 1961, which was quickly solved, during that period Wright had no competition in the Universities in reference to the program. Moreover, the Company wished to compensate Wright for his efforts by permitting him to share in business written by other agents in 1967 and 1968. His earnings from Southwestern in the years from 1962, when the program began to yield results, through 1968 were never below $17,000, with an average of approximately $22,000. Wright was named Territorial Man of the Year in 1964, 1965, and 1966, and was rewarded for this with cash payments from Southwestern. However, at no time was

Wright given an exclusive contract to write tax-sheltered annuities. Nevertheless, he was allowed to exploit the program without competition for at least two years after the last franchise was obtained.

Presently before us as a defense is defendant's motion to dismiss on the ground that on the facts and the law the plaintiff has shown no right to the relief he seeks. F.R.Civ.P., Rule 41(b). Earlier Southwestern filed a motion to dismiss for failure to state a claim upon which relief could be granted which was disposed of adversely to defendant and upon which we were affirmed by the Fifth Circuit Court of Appeals. Also, we denied a motion for summary judgment filed by defendant for the reason that "the affidavits, exhibits, and depositions do not establish a lack of material issue of fact but indicate many areas of contention." We find it unnecessary to treat extensively the question of whether or not the contract was in existence past October 10, 1960. We accept *arguendo* that it was in existence for an indefinite term during occurrence of the events above described.

The agency contract between Southwestern and Wright contained particularly pertinent and controlling provisions:

"5. (a) The commissions herein provided for shall constitute the sole and only payment or compensation to be allowed hereunder to Second Party [Wright].

\*    \*    \*    \*    \*    \*

"26. The territory hereby · assigned Second Party for the canvassing of applications for insurance hereunder shall be Houma, Louisiana, and vicinity, but said territory is not assigned exclusively to Second Party.

\*    \*    \*    \*    \*    \*

"28. (a) This contract cannot be modified by any verbal promise or statement by whomsoever made, and no modification hereof shall be binding upon the Company unless and until it shall have been approved at the Home Office of the Company by its President or a Vice President.

"(b) Notwithstanding any other provision of this contract, it is expressly agreed that same may be terminated by either party hereto by notice of termination, in writing, delivered or mailed to the other party, and that should Second Party fail to comply with any of the conditions of this contract, or should he violate or fail to comply with any law of the State first shown above, the Company shall have the right forthwith to terminate this contract without notice."

Indisputably, the contract was terminated by the Senior Vice President of the Company April 17, 1968 (see Appendix 6), in accordance with the terms of the contract for dismissal without cause. No case has been brought to our attention, nor do we know of any, which forbids one party under a contract such as this from terminating it after notice. See Dorsey v. State Farm Ins. Co., 294 F.2d 678 (5th Cir., 1961); Case v. State Farm Mutual Automobile Ins. Co. et al., 294 F.2d 676 (5th Cir., 1961); Martin-Parry Corp. v. N. O. Fire Detection Service et al., 221 La. 677, 60 So.2d 83 (1952); Shain v. Washington National Ins. Co., 308 F.2d 611 (8th Cir., 1962). Authorities cited by plaintiff in support of his contentions to the contrary clearly are inapposite.[1] Moreover, plaintiff's vested interest theory which he proffers as a bar to defendant's action is unpersuasive. See North American Company v. Bolling, 275 Ala. 457, 156 So.2d 144 (1963).

---

[1] *E. g.*, Sterling Colorado Agency, Inc. v. Sterling Ins. Co., 266 F.2d 472 (10th Cir., 1959); Phillips v. Mid-Continent Life Ins. Co., 130 So.2d 791 (La.App., 2d Cir., 1961); Sporl v. New York Indemnity Co., 176 La. 363, 145 So. 771 (1932); Gilson v. Continental Casualty Co., 196 So.2d 820 (La.App., 3rd Cir., 1967).

We cannot conclude that the Company's willingness to process policies written in 1967 by agents other than plaintiff constituted a breach of any obligation owed by the Company to plaintiff. The only communication remotely fitting the description of Paragraph 28 of the contract was a letter [2] by the President of the Company to the President of Northeast Louisiana State College on March 28, 1968. Only by a tortuous interpretation of this letter can we conclude that Southwestern was assigning Northeast Louisiana State College and its tax-sheltered annuity program exclusively to plaintiff; nor can we say that this letter could prevent the Company from terminating its agreement according to the contract with Wright.

As heretofore indicated, we do not think that the agent's letters of record were designed to prevent Southwestern from permitting other agents to write policies at the different institutions. It is indeed true that each of the colleges, generally, desired only one agent soliciting on its campus. Their method of enforcement was refusal to process policies written by others. But Southwestern was not a party to these designations, though it was conceivable that the colleges themselves could revoke the franchises. Moreover, Wright's having been denominated as "Servicing Agent" on several of the franchise agreements avails him nothing. The evidence clearly shows that that phrase was not meant to give Wright an exclusive position with the Company in writing tax-sheltered annuities.

The exhibits and testimony of other Southwestern agents and personnel evidence an intent by the Company to provide Wright a competition-free market only for a reasonable time, which two years clearly and fairly encompassed, within which to sell policies in this program. See Deposition of Williford, pp. 92–93. The expenses he incurred were nothing more than what could be expected by an agent opening a new field, with the understanding that his reimbursement would be in the form of commissions only. As amply demonstrated by plaintiff's evidence, the return on his investment of time was substantial. Obviously, his return would have been greater had he continued as a Southwestern agent; however, the contract to which he voluntarily agreed provided exactly for the termination of which he now complains. See Repsold v. N. Y. Life Co., 216 F.2d 479 (7th Cir., 1954); Buska v. Central Life Assurance Co., 32 Wis.2d 534, 145 N.W.2d 721 (1966). We cannot permit him to avoid the clear and unequivocal terms of that contract.

Plaintiff further contends that his character has been slandered by termination of his contract; and alternatively he asserts the equitable doctrine of unjust enrichment. Neither issue gives us pause. Absolutely no evidence was adduced by plaintiff which would remotely suggest that his character has been slandered under any test. The short answer to plaintiff's claim under the theory of unjust enrichment is that the case is governed not by principles of quasi-contract but by the express terms of the written contract. See LSA–C.C. 2294; Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1967) and authorities cited therein.[3]

While we hold strong empathy for plaintiff's contentions, we cannot make that feeling the basis of a decision in his favor here, where the terms of the contract he entered into with Southwestern dictate otherwise.

Plaintiff's suit is dismissed at his cost. Defendant will submit a judgment in accordance.

2. "I am glad to confirm that the franchise will be serviced by Mr. Robert E. Wright, Sr., in accordance with your request. . . ." (Exhibit Sterling–5.)

3. We are aware of a case, Inabnet v. Pan-American Life Insurance Co., decided by a state district court, presently on appeal before the Second Circuit Court of Appeals. A district court level decision is not binding on us.

THIS AGREEMENT, made the _____10th_____ day of _____October 1955_____

BETWEEN

# Southwestern Life Insurance Company

### a corporation of the State of Texas, whose Home Office is situated in Dallas, Texas, hereinafter described as the Company, and

_____Robert Ewell Wright, Sr._____
FULL NAME

of _____Homer_____ of _____Claiborne_____ State of _____Louisiana_____
(City)  (County or Parish)

hereinafter described as SECOND PARTY.

WITNESSETH, That these parties agree to transact business upon the following terms and conditions:

**GENERAL RELATION-SHIP OF PARTIES**

1. (a) Second Party shall canvass for applications for life insurance in Southwestern Life Insurance Company of Dallas, Texas, and forward such applications to the Company, and if policies are issued in connection with such applications, Second Party shall forthwith pay over, as directed by the Company, the premiums on such insurance so effected, but under no circumstances whatsoever shall any policy be delivered unless the applicant is in good health and the first premium shall have been duly settled.

(b) The relationship between the parties hereto created by this contract is one of limited agency and not of employer and employee.

**SCHEDULE OF FIRST YEAR COMMISSIONS**

2. Subject to all other provisions of this contract dealing with the payment of commissions, the Company will allow Second Party first year commissions on first year premiums paid, in cash, to the Company on policies issued under this contract as follows:

### SCHEDULE OF FIRST YEAR COMMISSIONS

| PLAN OF INSURANCE | FIRST YEAR COMMISSIONS Per Cent of the Premium for the First Policy Year (See Section 3) |
|---|---|
| Preferred Risk Whole Life | 75% |
| Preferred Risk Optional 20 Pay Life | 75% |
| Optional 20 Pay Life | 75% |
| Whole Life Increased Benefit | 75% |
| 20 Pay Increased Benefit | 75% |
| Preferred Risk 20 Payment Life | 75% |
| Limited Payment Life and Home Protector | |
| Premium paying period 15 years or longer | 75% |
| Premium paying period 13 or 14 years | 70% |
| Premium paying period 11 or 12 years | 65% |
| Premium paying period 10 years | 60% |
| Endowments, Insurance Income, and Deferred Annuities* | |
| Premium paying period 18 years or longer | 75% |
| Premium paying period 16 or 17 years | 65% |
| Premium paying period 15 years | 60% |
| Premium paying period 13 or 14 years | 55% |
| Premium paying period 12 years | 50% |
| Premium paying period 11 years | 45% |
| Premium paying period 10 years | 40% |
| Estate Builder and Estate Builder 65 | 75% |
| Income Provider (Amount $5,000 or more, and age 50 or under) | 75% |
| Income Provider (Amount less than $5,000 or over age 50) | 50% |
| Triple Option (Amount $5,000 or more) | 75% |
| Triple Option (Amount less than $5,000) | 50% |
| Southwestern Convertible | 75% |
| 20 Year Term | 50% |
| 5, 10, and 15 Year Term | 40% |
| 3 Year Term | 30% |
| Initial Term | 25% |
| Single Premium, including Life, Endowment, and Annuities* | 5% |

Joint Life or Juvenile Insurance, when issued, same as above.
Family Income Rider same as basic policy.
Accidental Death and Disability Supplemental Contracts same as basic policy.

*The commission on any annuity contract written on the resident of a state which levies an annuity premium tax shall be reduced by the Company to the extent that, in the sole discretion of the Company, is deemed necessary to offset the amount of the premium tax.

In the event the Company shall issue any policy not hereinabove described, or for which a commission is not hereinabove prescribed, the commission in connection therewith, if any, shall be established by the Company in its sole discretion.

**REDUCTION IN COM-MISSIONS IF PRE-MIUMS NOT PAID WITH-IN PERIOD PRESCRIBED BY COMPANY**

3. If the first premium payable under the terms of any policy is not paid by the Second Party, in cash, to the Southwestern Life Insurance Company at its Home Office in the City of Dallas within sixty days after the date of the Company's invoice or letter accompanying said policy when mailed or delivered to Second Party or within such lesser period of time as the Company may prescribe in its said invoice or letter of delivery, the commission on the said first premium will be reduced by ten per cent of the said commission.

**SERVICE COMMISSIONS**

4. (a) Subject to the other provisions of this contract dealing with the payment of service commissions, if the volume of the new insurance secured and paid for by Second Party in the contract year for which service commissions are computed shall amount to $100,000.00 or more, then the Company will allow Second Party service commissions at the percentage rate of 10% of the premiums paid, in cash, for the second policy year, and 5% of the premiums paid, in cash, for the third to the tenth policy years, inclusive. If the volume of new insurance secured and paid for by Second Party in any contract year for which service commissions are computed shall be less than $100,000.00, then no service commission shall be payable to Second Party.

A9231

(b) For the purpose of this section, the term "contract year" shall mean the separate consecutive periods of twelve months each from and after the date hereof.

(c) The date on which a completed application is actually received in the Home Office of the Company at Dallas, Texas, shall be considered the date on which insurance is secured for the purposes of this section.

(d) Service commissions will be paid only on premiums actually received, in cash, by the Company.

(e) Service commissions shall not be allowed on Single Premium Policies, or Single Premium Annuity Contracts.

(f) The number of service commissions and the amount thereof to be allowed on Life, Term, or Endowment Policies, or Deferred Annuity Contracts in connection with any of which the premium paying period is less than ten years, shall not be computed in accordance with the foregoing but shall be allowed in accordance with the then current rules and regulations of the Company. However, the forms of insurance and annuity contracts enumerated in this paragraph and the next preceding paragraph shall be included for the purpose of determining volume of new insurance secured in any contract year.

**GENERAL PROVISIONS WITH RESPECT TO COMMISSIONS**

5. (a) The commissions herein provided for shall constitute the sole and only payment or compensation to be allowed hereunder to Second Party.

(b) Any commission, first year or service, claimed hereunder in connection with any policy or contract, where the amount and number of such commissions is not definitely and absolutely determinable by the terms of this contract, shall be subject to determination by the President or a Vice President of the Company in his sole discretion, and such determination shall be binding and conclusive.

(c) In any and all cases where adverse claims are made to the same commission or a part thereof, the Company, acting through its President or a Vice President, shall have the absolute right to arbitrate, settle, and adjust such adverse claims, and its decision thereon shall be final and binding. Furthermore, in all cases in which any question or controversy of any kind or character shall arise or be asserted with respect to any such claimed commission, the determination of such disputed question or controversy by the Company, acting through its President or a Vice President, shall be conclusive and binding.

(d) Commissions on premiums paid in advance or on premiums deposited in advance with the Company will not be allowed until such premiums shall become due and are paid in accordance with the premium paying dates prescribed in the original policy contract, except when the Company, at its sole discretion, shall elect to sooner pay such commissions. Commissions will not be allowed on premiums waived or paid by the Company, or on occupational extra premiums or on other extra premiums which are charged to cover additional hazards.

**SERVICE COMMISSIONS IN THE EVENT OF CONTRACT TERMINATION**

6. Service commissions shall be allowed and paid only during the continuance in force of this contract, except:

(a) If this contract is terminated by the death or, in the sole judgment of the Company, the physical or mental disability of the Second Party, then the service commissions for which Second Party shall have theretofore qualified shall continue to be paid as they accrue to Second Party or to his legal representatives, as provided in this contract; and

(b) If this contract is terminated by either party after it shall have been in force for three or more consecutive contract years of twelve months each, for any reason other than the death or disability of the Second Party or the breach of its provisions by Second Party, then the service commissions for which Second Party shall have theretofore qualified, less a collection fee of one per cent of the premiums on which such commissions are payable, will continue to be paid as they accrue to Second Party, or to his legal representatives, until the number of policy years for which such service commissions are paid on account of business produced during any contract year, including those years and parts of years for which service commissions were paid prior to the termination of the contract, shall equal respectively the number of whole years of twelve months each that this contract shall have been continuously in force; subject always to the limitation, however, that in no event shall the number of policy years for which service commissions are paid on account of any such business exceed the number provided in the provisions governing service commissions contained in Section 4 of this contract.

**COMMISSIONS ON EXCHANGES**

7. Payment of commissions, if any, in connection with the exchange or conversion of policies effectuated through the instrumentality of Second Party, shall be in accordance with the then current rules and regulations of the Company.

**DISCONTINUED OR CHANGED POLICIES**

8. If an existing policy is discontinued or changed prior to or subsequent to the issuance of a new policy to the same insured, the first year and service commissions allowed on the new policy shall be determined by the then current rules and regulations of the Company.

**COMMISSIONS ON REINSTATEMENTS**

9. In the event of reinstatement of lapsed policies through the instrumentality of Second Party, the allowance of first year and service commissions shall be within the sole discretion of the Company, and its decision thereon shall be binding on all parties concerned.

**REFUNDED PREMIUMS**

10. Should the Company for any reason refund any premium on any policy secured hereunder, then Second Party shall forthwith repay, on demand, any commission received by virtue of said refunded premium; and Second Party further agrees to pay to the Company, on demand, the term rate for the period of time any policy, for any reason cancelled, was in force and for which the Company has not received and retained the premium, together with any other expenses incident thereto which may be charged by the Company.

**CUSTODY OF FUNDS AND PROPERTY OF COMPANY**

11. Second Party agrees to forthwith pay over to the Company all amounts collected or received by him hereunder, whether received in connection with applications for policies before they are issued or in connection with policies after they have been issued, or in any other manner, and to keep in trust separately and distinctly, without any right of offset, all funds belonging to the Company, and in no case whatever make any personal or other use of such funds; and Second Party agrees to and does hereby become responsible for all Company funds passing through Second Party's hands and the hands of persons employed by, or acting for or in behalf of, Second Party or deposited by Second Party in banks or trust companies. Second Party shall return to the Company at the proper time, or on demand, all not-paid-for policies, also all receipts intrusted to Second Party. Should Second Party withhold any funds, policies, vouchers, or other property belonging to the Company, or to a person whose application for insurance has not been accepted by the Company, after the same shall have been demanded in writing by the Company, then this contract shall, at the option of the Company, terminate, and all claims and rights whatsoever accrued or to accrue to Second Party under the provisions hereof shall be fully forfeited; but nothing herein shall be construed to affect any claims of the Company against Second Party.

**COMPANY PROPERTY**

12. All rate books, printed matter, and other property or materials furnished to Second Party by the Company are property of the Company and returnable on demand, and Second Party shall be fully responsible for any loss or damage to said property.

**ADVERTISING**

13. No circular, advertisement, or other matter or material including the name of, or referring to, Southwestern Life Insurance Company shall be printed, published or used in any way by Second Party unless it shall have been furnished by the Company or first approved in writing by the President or a Vice President of the Company.

**SPECIFIC LIMITATIONS**

14. Second Party is not authorized to make, alter, or discharge contracts for the Company, endorse checks made payable to the Company, deliver any policy except as directed by the Company, or under any circumstances to deliver any policy unless the insured named therein is in good health and the first premium shall have been duly settled, extend the time for payment of premiums, waive forfeitures, grant permits, quote special rates, guarantee dividends or make any estimate of dividends, or represent or bind the Company in any way not specifically authorized by this contract, and Second Party is not under any circumstances authorized to collect or receive first year deferred or renewal premiums, or to make any endorsements on the policies or contracts of the Company; and Second Party's authority shall not extend beyond the authority expressly granted herein. Second Party shall not receive any moneys due or to become due the Company, unless specifically authorized in writing.

**NON-ASSIGNABLE**

15. The rights and duties of the Second Party hereunder are non-transferable and non-delegable, and no assignment of this contract or of any commission, right, or benefit whatsoever due or to become due to Second Party hereunder shall be valid unless authorized in advance in writing by the President or a Vice President of the Company, and any assignment so authorized shall be subject to the provisions of this contract and to any and all indebtedness of Second Party to the Company then or thereafter existing.

A9232

SALES REPRESENTATION
16. Second Party agrees that for so long as this contract shall remain in force and effect he will not enter the service of any other life insurance company and will not submit a proposal or application for life insurance to any other company except with the prior consent in writing of the Company.

COMPANY BUSINESS
17. The parties hereto specifically recognize and confirm the absolute right of the Company to modify, alter, or cease to issue any form of insurance or annuities at any time issued or to be issued by the Company, to increase, decrease or otherwise change premium rates and premium paying requirements, to modify, change and make new requirements with respect to applicants and applications for insurance, and to do any and everything pertinent to the conduct of its business free of interference from or liability to Second Party.

NON-WAIVER
18. No extension of time, special agreement or indulgence of any kind or character, or failure to exercise any of its rights or privileges under this contract, shall constitute a waiver of such rights or privileges by Company.

CERTAIN ACTS OF SECOND PARTY PROHIBITED
19. Second Party agrees not to pay, allow, or give, or offer to pay, allow or give, directly or indirectly, as an inducement to insurance, any rebate of premiums payable on any policy, or any special favor or advantage in the dividends or other benefits to accrue thereon, or any paid employment or contract for service of any kind or anything of value whatsoever, or any valuable consideration or inducement whatever not specified in the policy or contract of insurance; or give, sell or purchase, or offer to give, sell or purchase, as an inducement to insurance, or in connection with any policy of insurance, or in connection with the sale thereof, any stocks, bonds or other securities of the Company writing the insurance or of any other insurance company, or of any other corporation, association or partnership, then organized or thereafter to be organized or any dividends or profits to accrue thereon.

INDEBTEDNESS OF SECOND PARTY
20. (a)  The Company may offset against any claim for compensation hereunder any debt or debts now due or that may become due at any time from Second Party to the Company, whether arising hereunder or otherwise, and such debt or debts shall be a first lien thereon. Should any extension of time for the payment or discharge of any obligation of Second Party be granted by the Company, such extension shall not in any way affect any of the provisions of this contract or impair any liability of the Second Party to the Company.

(b)  Unless otherwise agreed in writing by the parties hereto, the Company shall have the right, in its sole discretion, to charge interest on any indebtedness due it by the Second Party from the time said indebtedness is incurred until it is paid, such interest to be at the rate of five per cent per annum, and the Company shall have the sole right to determine to which indebtedness any payment made by Second Party, whether by offset or otherwise, shall be applied.

APPLICATIONS AND EXAMINATIONS
21. The Company shall at all times and in all cases have the absolute right to reject applications for insurance without specifying cause. Further, all applications and all Medical Examiner's reports, whether favorable or unfavorable, obtained by the Second Party shall be forthwith delivered to the Company. Any examination expense incurred in violation of the Company's rules and instructions shall be paid for by the Second Party. Also the Second Party shall pay the expense of the medical examination if he fails to deliver and pay for any policy issued as applied for or issued with a rating quoted in advance of the examination.

LITIGATION
22. Second Party shall not institute legal proceedings of any kind or character for any cause in connection with the transaction of Company business unless and until such action shall have been approved in writing by the Company. Should either of the parties hereto be sued because of any alleged act of Second Party, then Second Party shall defend the suit, and if the Company shall not be satisfied with the manner in which the defense is conducted it may employ counsel and conduct the defense at the expense of the Second Party, except that if the action be against the Company, and in its sole judgment Second Party be in no way at fault or responsible therefor, the expense of defending the Company shall be borne by the Company. The Company has and is hereby given the right to settle any claim or claims of applicants, policy holders, or others against the Second Party or against the Company, arising out of claims of misrepresentation or fault of Second Party, upon receipt of proof satisfactory to the Company of the justice of such claim or claims, and Second Party shall be liable to the Company therefor and agrees to reimburse and indemnify the Company against any such loss or expense.

SECOND PARTY'S RESPONSIBILITY FOR FIRST PREMIUMS AND CONDITIONAL RECEIPTS
23. Second Party shall be liable to the Company for the first premium provided for in all policies or contracts issued on applications secured by Second Party, as well as for any and all conditional receipts delivered to Second Party by the Company, and Second Party shall protect, indemnify, and save harmless the Company of and from any loss sustained because of improper use, non-return, or loss of any such conditional receipts.

CONFIDENTIAL RELATIONSHIP
24. This contract shall be considered strictly confidential, and the terms hereof shall not be disclosed to any person or persons, under penalty of forfeiture by Second Party of all benefits hereunder. Any and all information obtained by Second Party concerning any part of the Company's business, the names of its policyholders, the dates of payment of premiums, or otherwise, shall be considered confidential information, the property of the Company, and the Second Party expressly agrees never to divulge to any person or persons in any manner, either during the continuance of this contract or after its cancellation or termination, any such information acquired while acting hereunder.

PERFORMANCE AT DALLAS, TEXAS
25. All amounts payable hereunder to the Company or Second Party, and all delivery of property by Second Party to the Company, shall be made at the Home Office of the Company in the City of Dallas, Dallas County, Texas.

TERRITORY ASSIGNMENTS
26. The territory hereby assigned Second Party for the canvassing of applications for insurance hereunder shall be _____ Homer, Louisiana and vicinity _____ but said territory is not assigned exclusively to Second Party.

DEFINITIONS
27. (a)  Whenever the terms "life insurance," "insurance," or "policies" are used in this contract it is understood that they include annuity contracts issued on an individual basis.

(b)  Any personal pronoun used herein shall apply to persons of either sex.

MODIFICATION AND CANCELLATION
28. (a)  This contract cannot be modified by any verbal promise or statement by whomsoever made, and no modification hereof shall be binding upon the Company unless and until it shall have been approved in writing at the Home Office of the Company by its President or a Vice President.

(b)  Notwithstanding any other provision of this contract, it is expressly agreed that same may be terminated by either party hereto by notice of termination, in writing, delivered or mailed to the other party, and that should Second Party fail to comply with any of the conditions of this contract, or should he violate or fail to comply with any law of the State first shown above, the Company shall have the right to forthwith terminate this contract without notice.

EFFECTIVE DATE
29. This contract shall take effect as of the ___10___ day of ___October___, 19_55_, and covers and includes all agreements between the parties hereto except those expressed in any addition, alteration or modification hereof effected in writing, and supersedes any and all previous contracts and agreements between the parties hereto, it being understood, however, that all obligations to the Company heretofore incurred or assumed by Second Party, and liens created in connection therewith, shall continue to exist, and Second Party's right to any commissions payable under previous contracts is not impaired.

In Witness Whereof, the Company has caused these presents to be signed by its ___vice president___ and assistant secretary _____ and Second Party has hereunto set his hand on the day and year first above written.

SOUTHWESTERN LIFE INSURANCE COMPANY,

By _A. A. Davenport_
Vice-President

_A. A. Schwalke_
Ass't Secretary

_Robert Ewell Wright, Sr._
(Full Name)                          Second Party

307 W. Second St.
Number          Street

Homer, Louisiana
Town                          State

A9233

SOUTHWESTERN LIFE INSURANCE COMPANY

Dallas, Texas

AMENDMENT OF AGENCY CONTRACT

The Agency Contract of the undersigned Agent with Southwestern Life Insurance Company is hereby amended, by mutual consent of the parties hereto, to provide that the rate of first year and service commissions provided in said Contract shall not apply to commissions which may become payable in connection with the Executive Special Life Policies, and that the rate of commissions in connection with such policies shall be determined, subject to all other provisions of the Contract, according to the following schedule:

| | |
|---|---|
| First Year | 60% |
| Second and Third Years | 15% |
| Fourth through Tenth Years | 5% |

The effective date of this amendment is November 1, 1955.

*Robert E. Wright, Sr.*

SOUTHWESTERN LIFE INSURANCE COMPANY

By _____*R. R. Davenport*_____
        Vice President

A9234

SOUTHWESTERN LIFE INSURANCE COMPANY

Dallas, Texas

AMENDMENT OF AGENCY CONTRACT

The Agency Contract of the undersigned Agent with Southwestern Life Insurance Company is hereby amended, by mutual consent of the parties hereto, to provide that the rate of first year and service commissions provided in said Contract shall not apply to commissions which may become payable in connection with the Executive Protection Policies, and that the rate of commissions in connection with such policies shall be determined, subject to all other provisions of the Contract, according to the following schedule:

| First Year | 60% |
|---|---|
| Second and Third Years | 15% |
| Fourth through Tenth Years | 5% |

The effective date of this amendment is March 1, 1958.

*Robert E. Wright, Sr.*

SOUTHWESTERN LIFE INSURANCE COMPANY

By *RR Davenport*
        Vice President

A9235

SOUTHWESTERN LIFE INSURANCE COMPANY
DALLAS, TEXAS

AGENCY CONTRACT SUPPLEMENT
INDIVIDUAL A&S INSURANCE

The agency contract with respect to life insurance, bearing the effective date of _____October 10, 1955_____, between the undersigned Agent and the Company, herein referred to as the basic contract, is hereby supplemented to provide that the Agent shall also canvass for applications for Accident and Sickness insurance, and that with respect to the individual Accident and Sickness policies herein specified by name which are issued by the Company on applications procured by the Agent, the rate of first year commissions shall be in accordance with the following schedule:

| NAME OF POLICY | FIRST YEAR COMMISSION Percent of the Premium For the First Policy Year |
|---|---|
| Disability (non-can) Policy and Riders | 40% |
| Major Medical Policy | 40% |

With respect to policies on which first year commissions have been paid hereunder, service commissions equal to 20% of the premium paid for the second policy year and 10% of the premium paid for the third through the tenth policy years will be allowed, subject to the following conditions:

(a)  No service commissions will be allowed with respect to any policy unless the application on which it is issued is received by the Company at its Home Office in a contract year of the basic contract in which the Agent qualifies for service commissions on life insurance business.

(b)  No service commissions will be allowed or paid after the termination of this supplement, except upon the conditions under which service commissions on life insurance business are paid under the basic contract.

In the event the Company shall issue any individual Accident and Sickness policy not herein specified by name, or shall issue the above specified policies on a group, wholesale, or other mass basis, the commissions in connection therewith, if any, shall be established by the Company in its sole discretion.

To the extent applicable and not in conflict with the specific provisions hereof, the terms and provisions of the basic contract are incorporated herein.

This supplemental agreement shall take effect as of February 1, 1960, and may be terminated, independently of the basic contract, in the same manner and method by which the basic contract may be terminated, provided, however, that the termination of this supplemental agreement shall not of itself termi- nate the basic contract.

SOUTHWESTERN LIFE INSURANCE COMPANY
By: _R R Davenport_
     Vice President

_Robert E. Wright Sr._
Robert E. Wright, Sr.

Agent

A-2582
A9236

## ATTACH THIS COPY OF AMENDMENT TO YOUR CONTRACT

SOUTHWESTERN LIFE INSURANCE COMPANY

DALLAS, TEXAS

AMENDMENT

Any and all agreements of the undersigned with South-western Life Insurance Company are hereby amended, by mutual consent of the parties thereto, to include the following additional provision:

"In the event the Company shall issue any policy
or annuity subject to special and separate rules
with respect to commissions or other compensation
payable in connection therewith, the commissions
or compensation to which the undersigned shall be
entitled in connection therewith shall be estab-
lished by the Company in its sole discretion."

The effective date of this Amendment is March 14, 1962.

*Robert E. Wright, Jr.*

SOUTHWESTERN LIFE INSURANCE COMPANY

By _R R Davenport_
**Executive Vice President – Sales**
A9237

**SINCE 1903**

# SOUTHWESTERN LIFE INSURANCE COMPANY

POST OFFICE BOX 2699 / DALLAS, TEXAS 75221

JEFF NICKELSON, C.L.U.
VICE PRESIDENT AND AGENCY DIRECTOR

April 17, 1968

Mr. Robert E. Wright, Sr.
1015 Maple Street
Ruston, Louisiana  71270

Dear Bob:

Southwestern Life Insurance Company elects to
terminate the agency contract you have with
this Company.  This letter will serve as notice
that effective April 17, 1968 such contract is
so cancelled without prejudice to any claim or
claims which we may have against you now or at
any future time.

If you have not already done so, we ask that you
please return to the Shreveport Branch Manager
any supplies of the Company you may have in your
possession.

While we regret that it is necessary to sever
our contractual relations, we want to assure you
that you have our best wishes.

Sincerely

Jeff Nickelson